The **WASHINGTON FREE COMMUNITY, INC., et al., Plaintiffs,**

v.

**Jerry V. WILSON, Chief of Police, District of Columbia Metropolitan Police, et al., Defendants.**

**Civ. A. No. 1936–69.**

United States District Court, District of Columbia.

Aug. 5, 1971.

As Amended Aug. 6, 1971.

---

78

Curtis von Kann, and John Keats, Washington, D. C., for plaintiffs.

Nathan Dodell, Asst. U. S. Atty., and Madison McCulloch, Asst. Corp. Counsel, Washington, D. C., for defendants.

## OPINION AND ORDER

CORCORAN, District Judge.

Plaintiffs filed their complaint July 11, 1969 seeking declaratory and injunctive relief against John B. Layton, then Chief of the District of Columbia Metropolitan Police Department, Jerry V. Wilson, then Acting Chief and now Chief of the District of Columbia Metropolitan Police Department, and Grant Wright, Chief of the United States Park Police.

The corporate plaintiff was publisher of the Washington Free Press, an "underground" newspaper sold in the Washington, D. C. area. The individual plaintiffs were officers of the corporation, editors and occasionally street vendors of the paper.

The complaint alleged that officers of the Metropolitan Police and of the Park Police were harassing the plaintiffs' itinerant salesmen who were peddling the Free Press on the streets of Washington and in various park areas under the jurisdiction of the Department of Interior. Plaintiffs sought a declaration that the activities of the defendants and their agents were an unconstitutional abridgement of their rights to free speech, to free press, and to equal protection of the laws. They also sought to enjoin the defendants and their agents from interfering with the publication, circulation and distribution of the paper.

On August 4, 1969, this Court denied preliminary injunctions against both the Metropolitan Police and the Park Police holding *inter alia* that the plaintiffs had not met their burden of showing irreparable injury as required to gain preliminary relief. See Virginia Petroleum Jobbers Ass'n v. F. P. C., 104 U.S.App. D.C. 106, 259 F.2d 921 (1958). The Court of Appeals affirmed on December 19, 1969. Washington Free Community, Inc. v. Wilson, 138 U.S.App.D.C. 219, 426 F.2d 1213 (1969) (Bazelon, C. J. concurring as to the Metropolitan Police and dissenting as to the Park Police.)

After numerous delays agreed to by both parties an amended complaint was filed September 22, 1970. By then the Washington Free Press had ceased publication and it was superceded as plaintiff by the Quicksilver Times, another "underground" publication. Other individuals were added as plaintiffs and the action was denominated as a class action. John B. Layton was dropped as a defendant. A claim was made for compensatory and punitive damages, and a declaration of unconstitutionality was sought for 36 C.F.R. § 50.24 [1] under which the Park Police were acting.

After further agreed delays the Court bifurcated the proceedings as to the activities of the Metropolitan Police and the Park Police. The Court heard testimony and took evidence for two days as to the allegations against the Metropolitan Police and later heard argument on cross motions for summary judgment as to the Park Police issue. The Court then took the case under advisement.

A.  *Concerning the Metropolitan Police*

Either by affidavit or by live testimony the plaintiffs presented approximately 20 instances of confrontation between newspaper vendors and Metropolitan Police officers. These confrontations involved "move-on cases," warnings by the police officers that a license was required to peddle newspapers, or claims by the police officers that papers could not be sold from a "fixed location."

In every instance where plaintiffs' witnesses were able to recall the name or the badge number of the policeman involved, that policeman was called by the defendants and directly contradicted the testimony of plaintiffs' witness. Further, police department records indicate that in no instance testified to was a complaint ever made against an individual policeman or a request for disciplinary action filed or a civil lawsuit begun. Standing alone such contradictory testimony would require the Court to decide the issue on credibility.

However, in June of 1971, and prior to the hearing mentioned above, at the prodding of the American Civil Liberties Union the Corporation Counsel's office issued to Chief Wilson and the Metropolitan Police Department a new interpretation of 47 D.C.Code § 2336 (Supp. IV 1971). It was this section of the code police officers had been relying upon when they informed plaintiffs vendors that they needed a license to sell papers or had to "move on."

Section 2336 reads in pertinent part:

"No person shall sell any article of merchandise or anything whatever, *excepting newspapers sold at large and not from a fixed location,* upon the public streets, or from public space in the District of Columbia without a license first having been obtained  *  *  * ." (emphasis supplied)

That section is now interpreted to mean that

"A vendor who stacks his newspapers on the sidewalk without benefit of any physical accouterments other than the newspapers themselves is not selling newspapers from a 'fixed location' within the meaning of Section 47–2336  *  *  * . This is true despite the fact that the vendor may frequently be found selling newspapers from the same location. Accordingly, the vendor may sell his newspapers without first obtaining a license." [2]

---

1. See *infra* at 81.

2. See Appendix A.

Chief Wilson then sent on June 7, 1971 a directive to the police force stating:

"Members of the force are advised that the selling of newspapers from stacks placed on the sidewalk without the benefit of any other physical accouterment is not a violation of Section 47–2336, notwithstanding the facts that the vendor has not first obtained a license or that he may sell such newspapers daily from the same location." [3]

In the Court's view the new opinion and directive effectively reverses police department policy vis-a-vis underground newspaper vendors. It is now clear that the police will not tell vendors they must possess a license to sell papers or must "move on" and will not challenge them for stacking papers on the sidewalk or for standing at a fixed location while they peddle their papers.

The various confrontations described by the plaintiffs' witnesses and affidavits arose out of the understanding then prevalent among police officers as to the meaning of the D. C. Statute covering street vendors of newspapers. Until the Corporation Counsel interpreted that statute for the police department those police officers were acting under the impression that a vendor needed a license, could not stack papers on the sidewalk, and would have to keep moving. In other words the police officers were acting under color of authority as they understood that authority. Under the new interpretation, however, there should be no repetition of the police activities on which the complaint was founded and there is accordingly no apparent reason for injunctive or declaratory relief.

Plaintiffs nevertheless seek injunctive relief relying on Lankford v. Gelston, 364 F.2d 197 (4th Cir. 1966). In Lankford the Court enjoined the commissioner of the Baltimore City Police whose officers had on 300 occasions over a period of 19 days searched persons' homes for suspects without warrants and relying only upon uninvestigated and anonymous tips.

It was a routine practice and procedure conceived and ordered by high ranking police officials. The Court issued the injunction despite the cessation of such practices because of the grave character of the police department's conduct. "These raids were not isolated instances undertaken by individual police officers. They were rather the effectuation of a plan conceived by high ranking officials." Id. at 202.

The crucial elements that led the Court to order injunctive relief in Lankford—the vast number of instances over a short span of time and the fact that such action was following a plan and procedure worked out by high police officials—are not present in the case at bar.

As Chief Judge Bazelon wrote in his concurrence referred to above, "a trial might show there is no substantial threat of continuing injury." Washington Free Community v. Wilson, supra 426 F.2d at 1216. It so happened in this case by reason of the testimony concerning the new directive to the police. Any threat to First Amendment rights that existed previously has been cured by the new interpretation of the statute. Thus lacking a threat to First Amendment rights there is no reason for injunctive relief against the Metropolitan Police Department on the vending issue.

To avoid future problems the Court will re-emphasize that the plaintiffs have the right to sell and distribute their papers without obtaining a license, that the plaintiffs can stack the papers on the sidewalks, and that the plaintiffs are not required to keep moving. On the other hand, plaintiffs do not have a right to engage in disorderly or other conduct which could properly lead to police investigation or interference.

\* \* \*

There was also testimony concerning one incident unrelated to newspaper vending. Neutral observers testified concerning the arrest of plaintiff Terry Becker by defendant Police Captain Earl

3. See Appendix B.

Drescher during a demonstration near the Watergate. Becker was arrested for crossing police lines. Witnesses for Becker said he was exhibiting a validly issued police press pass, though Captain Drescher denied that Becker was wearing his pass at the time of the arrest.

Assuming the arrest happened as Becker's witnesses testified, the incident appears to have been an isolated one since plaintiffs did not prove or offer to prove any other cases of police interference with valid news gathering by plaintiffs' reporters nor failure on the part of the police to recognize and honor a valid press pass carried by plaintiffs' reporters.

Rather than to seek injunctive and declaratory relief based upon an isolated incident the appropriate procedure for plaintiff Becker to follow would seem to be to pursue the legal remedy available to him, namely, to file an individual complaint against Captain Drescher and his superiors for false arrest. The Court of Appeals has very recently laid down the principles under which Becker can proceed and possibly recover under either the common law or 42 U.S.C. § 1983. Carter v. Carlson, 447 F.2d 358 (D.C. Cir., July 23, 1971).

Plaintiffs' motions for declaratory and injunctive relief and for damages against the Metropolitan Police are denied.

### B. *Concerning the Park Police*

Vendors of plaintiffs' newspaper have on occasion been arrested by United States Park Police while selling or attempting to sell newspapers in national capital park areas. In executing such arrests the Park Police were acting under regulation 36 C.F.R. § 50.24 promulgated by the Secretary of Interior which provides in pertinent part:

"(a) Soliciting.

\* \* \* \* \* \*

(2) Commercial soliciting of any kind in park areas without an official permit is prohibited \* \* \*

"(c) Sales. No sales shall be made nor admission fee charged, and no arti-

cle shall be exposed for sale in a park area without an official permit."

The foregoing regulation is issued pursuant to 16 U.S.C. § 3 which authorizes the Secretary of Interior to

"make and publish such rules and regulations as he may deem necessary or proper for the use and management of the parks \* \* \* under the jurisdiction of the National Park Service \* \* \*. He may also grant privileges, leases, and permits for the use of the land for the accommodation of visitors in the various parks \* \* \*."

The "National Park Service" referred to in the foregoing statute is now titled the "National Park System" and it has jurisdiction over the "National Capital Parks" i. e. the national park areas in Washington, D. C. 16 U.S.C. § 1c. Among such parks in the Washington area are Dupont Circle, Farragut Square, Lafayette Square, The Ellipse, the Mall and the areas surrounding the various national monuments.

■■ The regulation in question embraces the sale and distribution of newspapers which necessarily requires an examination of the regulation in terms of First Amendment rights. Though it is clear that the rights guaranteed under the First Amendment are not absolute, Cox v. Louisiana, 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965); Kunz v. New York, 340 U.S. 290, 71 S.Ct. 312, 95 L.Ed. 267 (1951); Cox v. New Hampshire, 312 U.S. 569, 61 S.Ct. 762, 85 L. Ed. 1049 (1941), it is equally clear that any prior restraint by the Government on the exercise of such rights is subject to the closest scrutiny and bears "a heavy presumption against its constitutional validity." New York Times Company v. United States, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (June 30, 1971); Bantam Books, Inc. v. Sullivan, 372 U. S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963).

■■ The regulation in question absolutely forbids the sale of newspapers in the national park system without a permit. In its effect on the national capital parks it is overly broad and unconstitu-

tional.[4] The Supreme Court in Amalgamated Food Employees Union Local 590 v. Logan Valley Plaza, 391 U.S. 308, 315, 88 S.Ct. 1601, 1607, 20 L.Ed.2d 603 (1968) stated that

"streets, sidewalks, *parks,* and other similar public places are so historically associated with the exercise of First Amendment rights that access to them for the purpose of exercising such rights *cannot constitutionally be denied broadly and absolutely."* (emphasis supplied)

The licensing system established by § 50.24 is designed to regulate sales in the parks to protect the public's interest in maintaining the parks as a refuge from the hustle and bustle of the city and the commercial world and as places of tranquillity and repose. That is a legitimate governmental interest which the Supreme Court has permitted to be protected under certain licensing systems that restrict the exercise of First Amendment rights. Cox v. Louisiana, supra; Poulos v. New Hampshire, 345 U. S. 395, 73 S.Ct. 760, 97 L.Ed. 1105 (1953); Cox v. New Hampshire, *supra.* But it is to be noted that each of these approved licensing systems had clear standards which narrowly defined the proscribed action.

The Government argues that the standard here is the permanence of the vending location and that as a result itinerant vendors are denied permits as a matter of course. While the defect of unfounded discretion in granting licenses may be cured by this standard, the defect of overbreadth still remains.

Such an absolute prohibition on the distribution of literature without a permit in areas traditionally open to the public for the exercise of First Amendment rights has never been upheld by the Supreme Court. "The right to distribute handbills * * * may not be prohibited at all times, at all places, and under all circumstances. This has been

beyond controversy since the decision in Lovell v. [City of] Griffin, 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949 [(1938)]." Jamison v. Texas, 318 U.S. 413, 416, 63 S.Ct. 669, 672, 87 L.Ed. 869 (1943).

The Government argues that it is not vitally necessary that the papers be sold inside the parks as they can be sold at all entrances and exits. However, "[O]ne is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." Schneider v. State of New Jersey, Town of Irvington, 308 U.S. 147, 163, 60 S.Ct. 146, 84 L.Ed. 155 (1939).

The national capital parks covered by the regulation in question vary widely in character, appearance and function. Such parks as Dupont Circle, Farragut Square and Lafayette Square lie in the center of business activity. They provide crosswalks for thousands of citizens, are the scenes of fashion shows, concerts and plays, and are often the sites for demonstrations. The peace and tranquillity sought to be protected by the regulation is rarely to be found within these areas.

In contrast such places as the Lincoln Memorial, Washington Monument, Jefferson Memorial and their surrounding grounds are national shrines which despite the comings and goings of thousands of tourists maintain an atmosphere of calm, tranquillity, and often reverence. The governmental interest in protecting such an atmosphere is substantial and overriding.

The regulation in question announces no standards and does not differentiate between the types of parks. As it relates to the vending of newspapers in the national capital park areas it must be struck down. As the Supreme Court has pointed out

"even though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means

4. The Court's decision refers solely to the sale of newspapers in national capital park areas. No opinion is rendered as

to the regulation's constitutionality as it effects other areas in the national park system.

that broadly stifle fundamental personal liberties when the end can be more narrowly achieved." Shelton v. Tucker, 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231, 237 (1960).

In order to avoid constitutional impairment the regulation as it effects parks in the Washington, D. C. area must be rewritten to take into consideration the varying character of the national capital parks and to establish certain standards appropriate to a constitutionally protected right.

Plaintiffs' motion for summary judgment is granted.

So ordered.

## APPENDIX A

### GOVERNMENT OF THE DISTRICT OF COLUMBIA

#### OFFICE OF THE CORPORATION COUNSEL

DISTRICT BUILDING
WASHINGTON, D. C. 20004

June 2, 1971

MEMORANDUM TO: Jerry V. Wilson, Chief
Metropolitan Police Department, D. C.

FROM: C. Francis Murphy
Corporation Counsel, D. C.

SUBJECT: Newspaper Vendors

———◆———

It is alleged by Ralph J. Temple, Esq., Legal Director, American Civil Liberties Union Fund, in a letter to me dated April 1, 1971, a copy of which is enclosed, that some police officers are interpreting the law prohibiting the sale of newspapers from a "fixed location" without a license, as permitting arrests of sidewalk newspaper vendors who lack licenses if they place a stack of newspapers on the sidewalk and stand there selling them.

Section 47–2336, D.C.Code, 1967 ed. provides:

"No person shall sell any article of merchandise, or anything whatever, *excepting newspapers sold at large and not from a fixed location,* upon the public streets, or from public space in the District of Columbia, without a license first having been obtained * * *." (Emphasis added.)

I am of the opinion that a vendor who stacks his newspapers on the sidewalk without benefit of any physical accouterments other than the newspapers themselves is not selling newspapers from a "fixed location" within the meaning of Section 47–2336, D.C.Code, 1967 ed. This is true despite the fact that the vendor may frequently be found selling newspapers from the same location. Accordingly, the vendor may sell his newspapers without first obtaining a license.

This memorandum should not be taken as an admission by the District of Columbia that any police officer has interpreted the phrase "fixed location" in the manner alleged by Mr. Temple. It seems prudent, nonetheless, since the possibility of misinterpretaton has been raised, that you advise the members of the Metropolitan Police Department of my interpretation. Please forward to me a copy of your memorandum

to the Force when it is distributed, unless you wish me to review it in advance of distribution.

It is my intention to forward a copy of your memorandum to the Force to Mr. Temple. Presently, I am responding to Mr. Temple's letter and giving him a copy of this memorandum. A copy of my letter to Mr. Temple is enclosed for your information.

Attachment.

## APPENDIX B

## GOVERNMENT OF THE DISTRICT OF COLUMBIA

Metropolitan Police Department

June 7, 1971

MEMORANDUM

SUBJECT: Newspaper Vendors

TO THE FORCE:

A question has arisen concerning the application of 47 D.C.Code S 2336 (1967) to non-licensed newspaper vendors who place their newspapers in a stack on a public sidewalk and sell them from that location. Section 47–2336 provides:

> "No person shall sell any article of merchandise, or anything whatever, *excepting newspapers sold at large and not from a fixed location,* upon the public streets, or from public space in the District of Columbia, without a license first having been obtained * * * ." (Emphasis added.)

The Corporation Counsel has issued the opinion "that a vendor who stacks his newspapers on the sidewalk without the benefit of any physical accouterments other than the newspapers themselves is not selling newspapers from a 'fixed location' within the meaning of Section 47–2336, D.C.Code, 1967 ed. This is true despite the fact that the vendor may frequently be found selling newspapers from the same location. Accordingly, the vendor may sell his newspapers without first obtaining a license."

Therefore, members of the force are advised that the selling of newspapers from stacks placed on the sidewalk without the benefit of any other physical accouterment is not a violation of section 47–2336, notwithstanding the facts that the vendor has not first obtained a license or that he may sell such newspapers daily from the same location.

(s) Jerry V. Wilson
Jerry V. Wilson
Chief of Police